## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| GALLATIN WILDLIFE ASSOCIATION, | CV 15-27-BU-BMM |
| Plaintiff, | |
| vs. | AMENDED MEMORANDUM IN SUPPORT OF ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| UNITED STATES FOREST SERVICE, LEANNE MARTEN, in her official capacity as Regional Forester of the United States Forest Service, and UNITED STATES FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

The Court denied Gallatin Wildlife Association's ("Gallatin") motion for a preliminary injunction on July 10, 2015. (Doc. 43). The Court now issues a memorandum further explaining its decision.

### I.SYNOPSIS

Gallatin has moved this Court pursuant to Fed. R. Civ. P. 65, for a preliminary injunction that prohibits domestic sheep grazing on the Cottonwood and Fossil-Hellroaring allotments managed by the United States Forest Service ("Forest Service"). (Doc. 3). The Cottonwood and Hellroaring allotments constitute two of the seven grazing allotments subject to the action for declaratory

1

and injunctive relief filed by Gallatin on June 11, 2015. Gallatin argues that it needs a preliminary injunction with respect to grazing on the Cottonwood and Hellroaring allotments to allow the Court to address the Forest Service's violations of the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the National Forest Management Act ("NFMA"). *Id*. Gallatin further claims that it needs the injunction to prevent irreparable harm to grizzly bears, bighorn sheep, and Gallatin's own interests in the two allotments. *Id*. The Forest Service and the grazing permittee intervenors Helle Livestock and Rebish/Konen Livestock Limited Partnership (collectively "Permittees") oppose the motion. (Docs. 31, 32).

## II.FACTUAL and PROCEDURAL BACKGROUND

### A.    Factual Background

The Beaverhead-Deerlodge National Forest ("BDNF") is located in southwestern Montana. (Doc. 1 at 5-6). Montana Fish, Wildlife, and Parks ("MFWP") introduced the Greenhorn herd of bighorn sheep into the Gravelly Landscape section of the BDNF twelve years ago. (AR 48:5129). Seven domestic sheep allotments also occupy the Gravelly Landscape. (AR51:5160-61). Domestic sheep have grazed on the Gravelly Landscape since the 1860s. (Doc. 31 at 2). The sheep allotments date back to the 1920s. (Doc. 27-1 at 2). The Forest Service manages these domestic sheep allotments. (Doc. 1 at 5).

2

Rebish/Konen Livestock holds the Cottonwood allotment grazing permit. (Doc. 31 at 8). Domestic sheep grazing started on the Cottonwood allotment on July 12, 2015, and is set to end on September 14, 2015. (Doc. 4-1 at 9). Helle Livestock holds the Fossil-Hellroaring allotment grazing permit. (Doc. 31 at 5). Domestic sheep grazing started on the Fossil-Hellroaring allotment on July 18, 2015, and is set to end on September 14, 2015. (Doc. 4-1 at 2).

### B.   Procedural Background

Gallatin filed a complaint for declaratory and injunctive relief against the Forest Service, Regional Forester Leanne Marten, and the U.S. Fish and Wildlife Service (collectively "Federal Defendants") on June 11, 2015. (Doc. 1). Gallatin challenges the Annual Operating Instructions, the 2009 Revised Forest Plan, the U.S. Fish and Wildlife Service's 2013 Biological Opinion for the Revised Forest Plan, and the Forest Service's failure to prepare supplemental NEPA analysis on the Cottonwood and Fossil-Hellroaring Allotment Management Plans ("AMPs"). *Id.*

Gallatin moved this Court for a preliminary injunction against the Forest Service on June 15, 2015. (Doc. 3). Gallatin sought an order to enjoin grazing on the Cottonwood and Fossil-Hellroaring allotments, which constitute two of the seven allotments subject to Gallatin's action. The Court granted the Permittees' motion to intervene. (Doc. 29). The Forest Service and Interveners opposed the

3

preliminary injunction. (Docs. 31, 32). Gallatin filed their reply. (Doc. 36). The

Court held a hearing on July 8, 2015. (Doc. 39).

### III. STANDARD OF REVIEW

An injunction represents an extraordinary remedy that the Court should

never award as a matter of right. *Winter v. Natural Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must establish that

(1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm

in the absence of preliminary relief before a decision on the merits can be issued,

(3) the balance of equities tips in his favor, and (4) an injunction is in the public

interest. *Id*. at 20, 22. The *Winter* standard applies to Gallatin's NFMA and NEPA

claims. *Alliance for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1268 (D.

Mont. 2014).

A modified *Winter* analysis applies to Gallatin's ESA claims. *Id*. at 1265-68.

The Court retains discretion in ESA cases to employ a sliding scale approach when

it evaluates the plaintiff's likelihood of success on the merits. *Id*. at 1266. Judicial

application of the lesser "serious questions" test applies upon a satisfactory

showing of the other three *Winter* prongs. *Id*. A preliminary injunction based on

ESA claims is warranted when the plaintiff demonstrates that serious questions

going to the merits have been raised and the balance of hardships tips sharply in

the plaintiff's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1134-35 (9th Cir. 2011).

Gallatin's claims against the Forest Service stem from alleged violations of

ESA, NEPA, and NFMA. (Docs. 1, 3). The Court reviews compliance with these

laws under the judicial review provisions set forth in the APA. *Native Ecosystems*

*Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002).

The Court may set aside agency decisions under the APA if it determines

that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(A). The Court conducts a narrow

review under the APA's arbitrary and capricious standard that prohibits the Court

from substituting its judgment for that of the agency. *Earth Island Inst. v. U.S.*

*Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006). The Court will conclude that the

Forest Service's actions qualify as arbitrary and capricious only when the record

plainly demonstrates that the Forest Service has made a clear error in judgment.

*The Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008); *see Marsh v. Or.*

*Natural Res. Council*, 490 U.S. 360, 378 (1989).

## IV. ANALYSIS

### A. *Irreparable Harm*

Gallatin contends that in the absence of a preliminary injunction, bighorn

sheep, grizzly bear, and its own members will suffer irreparable harm before a

decision on the merits of this case can be reached. The Ninth Circuit has defined irreparable environmental harm as an injury that is "permanent or at least of long duration." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). No presumption of irreparable harm exists, even in environmental cases. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 2015 WL 3756708, at *14 (9th Cir. June 17, 2015). Gallatin suggests that if this Court enjoins grazing from occurring this year, irreparable harm to bighorn sheep, grizzly bear, and its own members can be avoided.

Domestic sheep have grazed on the Gravelly Landscape since the 1860s. (Doc. 31 at 2). MFWP introduced the bighorn sheep to the Gravelly Landscape twelve years ago. (AR 48:5129). Grizzly bear populations in the Yellowstone ecosystem have increased substantially between 1975 and 2004. (AR36:4641-42). This increase has expanded grizzly bear activity in the Gravelly Landscape. Enjoining the grazing would allow bighorn sheep and grizzly bear to begin using the Gravelly Landscape more freely, and would allow Gallatin's members to observe a more natural landscape.

Gallatin's motion for a preliminary injunction applies only to the domestic sheep to be grazed on Cottonwood and Fossil-Hellroaring allotments. These allotments constitute two of the seven allotments covered by Gallatin's original action for declaratory and injunctive relief. Gallatin argues that the domestic sheep

6

to be grazed on the Cottonwood allotment and the Fossil-Hellroaring allotments during the 2015 grazing season could be absorbed into the remaining five allotments without harm to the Permittees.

Federal Defendants represented to the Court at the hearing that these five remaining allotments could not absorb the domestic sheep to be grazed on the Cottonwood and Fossil-Hellroaring allotments. Federal Defendants claimed that the remaining five allotments either were being rested for the 2015 grazing season or were otherwise occupied. In fact, the Interveners clarified that they hold the allotment grazing permits on all seven allotments subject to Gallatin's action. Interveners further clarified that they intend to use all seven allotments during the 2015 grazing season, and, thus the five allotments could not absorb the sheep from the Cottonwood and Hellroaring allotments. The Court assumes that counsel for Federal Defendants did not intend to mislead the Court. The Court suggests, however, that counsel for Federal Defendants inform themselves of the factual background to which Gallatin's claims apply.

Gallatin contends that enjoining grazing this year will remedy the ongoing harm to bighorn sheep and grizzly bears.  This position suggests that the harm caused during the past 150 years of grazing would not be irreparable. Gallatin fails to explain how this historical grazing apparently has not caused irreparable harm,

7

yet allowing grazing to occur during the 2015 grazing season would cause irreparable harm.

Gallatin first contends that bighorn sheep will suffer irreparable harm in the absence of a preliminary injunction. Gallatin points to the risk of disease transfer from the domestic sheep grazing on the Cottonwood allotment. A distance of between six and seventeen miles separates the bighorn sheep from the Cottonwood allotments. (AR51:5167). The MFWP strives to maintain a separation of at least nine miles. (AR48:4870). The Forest Service's Report to the Chief shows that no management removals of bighorn sheep have taken place as a result of domestic sheep grazing. (AR51:5179-81). Likewise, no bighorn die-offs have been associated with domestic sheep grazing on BDNF allotments, and interspecies comingling have not occurred during that period. *Id*. Gallatin has failed to point to any new circumstances that make disease transfer likely this year when it has not occurred historically.

Gallatin further argues that the bighorn sheep will suffer irreparable harm because the existence of the domestic sheep grazing on the allotments prevents the bighorn sheep herd from growing. Gallatin contends that enjoining the domestic sheep from grazing on the allotments will allow the bighorn sheep herd to grow in the future. Gallatin fails to explain why the bighorn sheep herd will not begin to grow if the domestic grazing is stopped next year instead of this year. No evidence

8

has been provided to suggest that the bighorn sheep will suffer irreparable harm in the absence of a preliminary injunction.

Gallatin also argues that its members will suffer irreparable harm if the domestic grazing occurs this year. Gallatin contends that the domestic grazing will harm its members' aesthetic and recreational interests in the area. Gallatin again fails to explain how this harm will be irreparable given the 150 years of grazing that has occurred on these allotments. Enjoining the grazing will likely change the landscape and the species present in the area, as Gallatin argues. A decision to enjoin the grazing next year, however, will accomplish this same result. Gallatin has failed to demonstrate that allowing the domestic grazing to occur this year will cause any new harm to the landscape that has not already occurred in the past 150 years. Gallatin has failed to demonstrate that its members will suffer irreparable harm in the absence of a preliminary injunction.

Gallatin finally argues that grizzly bear will suffer irreparable harm in the absence of a preliminary injunction. Gallatin contends that grizzly bear will be displaced by the domestic sheep and their guard dogs, and that grizzly bear will not access a wildlife corridor linking the area with habitat in Idaho. Gallatin does not explain why grazing domestic sheep again this year will cause irreparable harm to grizzly bears given the long history of grazing in this area. Gallatin has pointed to nothing unique to this grazing period which will cause harm beyond the harm that

has occurred during the past 150 years, and has provided no evidence for why this year's harm would be irreparable while the last 150 years of harm could be remedied by enjoining the grazing this year.

Gallatin also contends that grizzly bear will be irreparably harmed by the domestic grazing because the Forest Service grazing regulations permit ranchers to use lime on sheep carcasses. The lime is intended to make the carcass unpalatable to grizzly bear. Instead, Gallatin points to evidence that grizzly bear still eat the treated carcasses and suffer harm from the lime. Federal Defendants point out that lime has not been used for a number of years. Federal Defendants contend that removing the carcass proves easier than liming the carcass, so ranchers have removed the carcasses in recent years. Gallatin points to no evidence to suggest that liming is more likely this year than it has been in the past. Given the history of grazing, and the history of not using lime on carcasses, Gallatin has failed to demonstrate any irreparable harm will occur to grizzly bear if grazing occurs this year.

### B. Likelihood of Success on the Merits

Gallatin contends that the viability analysis conducted as part of the Forest Plan violates both NFMA and NEPA. Gallatin next argues that the Federal Defendants have violated NEPA by failing to conduct a supplemental analysis on

the Allotment Management Plans. Gallatin finally argues that the Biological

Opinion for the forest plan violates the Endangered Species Act.

i.    *Viability Analysis Violates NFMA*

Gallatin asserts that the Forest Service employed flawed methodology in the

viability analysis, which violates NFMA. (Doc. 4 at 17-20). Gallatin also claims

that the Forest Service failed to analyze fully the risk to bighorn sheep viability as

a result of comingling between bighorn and domestic sheep. *Id*. at 20-22. The

Court will conclude that the Forest Service acted arbitrarily and capriciously only

when the record plainly demonstrates that the Forest Service made a clear error in

judgement. *McNair*, 537 F.3d at 994.

1.    *Habitat-as-Proxy Methodology*

The Forest Service's viability analysis implements the "habitat-as-proxy," or

"coarse filter," approach to evaluate population viability and monitor the effects of

management on bighorn sheep. (AR27:3284). The habitat-as-proxy approach

derives from the assumption that maintenance of the acreage of habitat necessary

for survival will ensure a species' survival. *Native Ecosystems Council v. Tidwell*,

599 F.3d 926, 933 (9th Cir. 2010).

Gallatin alleges that the Forest Service's habitat-as-proxy viability analysis

proves unreliable and inaccurate to measure the existing amount of bighorn sheep

habitat. (Doc. 4 at 19). Gallatin claims that the Forest Service failed to consider

11

acreage unavailable to bighorn sheep as a consequence of domestic sheep grazing allotments. *Id*. Gallatin also argues that methodology fails to ensure viability for species, such as bighorn sheep, with consistently sparse population densities and those that occupy highly fragmented or isolated habitats. *Id*. at 20.

The Forest Service's methodology for evaluating viability is entitled to deference. *Marsh*, 490 U.S. at 378. The Court will defer to the judgment of the Forest Service's decision to use habitat-as-proxy unless the record indicates that the Forest Service made a clear error of judgment. *Id*.

The Forest Service must describe both the quantity and quality of habitat necessary to sustain the viability of the species in question. *McNair*, 537 F.3d at 997-98. The Forest Service's method for measuring the existing amount of that habitat must be reasonably reliable and accurate. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005). The Court may find the Forest Service's use of habitat-as-proxy arbitrary and capricious if, for example, the EIS acknowledges the unclear relationship between the species and the habitat, *see Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 891 (9th Cir. 2007), the record fails to describe the type of habitat that is necessary to sustain the viability of the species, *Native Ecosystems Council*, 428 F.3d at 1250, or the record indicates that the Forest Service based its habitat calculations on outdated or inaccurate information, *see Lands Council v. Powell*, 395 F.3d 1019, 1036 (9th Cir.

2005); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 971-72 (9th Cir. 2002).

The EIS does not acknowledge an ambiguous relationship between bighorn sheep and their habitat. The Forest Plan is based on a 2002 Analysis of the Management Situation, an extensive public comment period, and the U.S. Fish and Wildlife Service's 2009 FEIS. (AR28:3702). The Forest Service also has evaluated supplemental materials in connection with BDNF management, such as the Forest Service's 2011 Report to the Chief Forester regarding Bighorn Sheep Interactions with Domestic Sheep on the BDNF and the U.S. Fish and Wildlife Service's 2013 Supplement to the Biological Opinion on the Effects of the 2009 Revision of the BDNF Land and Resource Management Plan on Grizzly Bears. (AR51; AR36).

The record reveals that the Forest Service acknowledged no unclear relationship between bighorn sheep and their habitat, identified the type of habitat occupied by bighorn sheep in BDNF, and based its calculations on reliable information. The record further indicates that the Forest Service provided for bighorn sheep viability in the Forest Plan and considered fully materials relevant to bighorn sheep viability.

This Court gives deference to the Forest Service's methodology for evaluating viability. *Marsh*, 490 U.S. at 378. Based on the information before the Court at this time, the Forest Service does not appear to have acted arbitrarily or

13

capriciously. Gallatin has failed to demonstrate a likelihood of prevailing on the merits.

2. *Bighorn Sheep Risk Factors*

Gallatin contends that the Forest Service failed to analyze fully the risk to bighorn sheep viability as a result of comingling between bighorn and domestic sheep. A sound viability analysis considers all currently available scientific data. *Lands Council v. McNair*, 629 F.3d 1070, 1081 (9th Cir. 2010). The Forest Service must explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable. *McNair*, 537 F.3d at 994. The Court also will defer to the judgment of the Forest Service as to what evidence is, or is not, necessary to support the bighorn sheep viability analysis. *Id.* at 992.

The Forest Service recognizes that domestic sheep generate conflicts with bighorn sheep. (AR27:2913; AR51). The EIS acknowledges the potential for disease transmission from domestic sheep to bighorn sheep. (AR27:2732). The EIS addressed potential sheep conflicts by closing or transferring to existing permittees with no increase in permit use those domestic sheep allotments that become vacant. (AR27:2822). The EIS appears to defer the resolution of bighorn and domestic sheep conflicts to a determination on an allotment by allotment basis in the Allotment Management Plans. (Doc. 4 at 21).

14

The Forest Service issued a report to the Chief Forester regarding bighorn and domestic sheep interactions on February 10, 2011. (AR51). The Forest Service determined that no Forest Plan Amendment was necessary to provide for further bighorn sheep viability. The Forest Service concluded that the Forest Plan contains sufficient management directives that sufficiently support bighorn sheep viability and continued domestic sheep grazing on the Gravelly allotments. (AR51:5179). The Forest Service relied on extensive research conducted by MFWP, the USDA, and the Western Association of Fish and Wildlife Agencies, among others, in reaching this conclusion, including the specific findings that: (1) no management removals of bighorn sheep have taken place as a result of domestic sheep contact; (2) no bighorn die-offs are associated with BDNF allotments; (3) lack of evidence of interspecific comingling; (4) additional transplant bighorns would not be added to the Gravelly Range in the absence of allotments due to the presence of domestic sheep on bordering private lands; and, (5) Forest Plan Wildlife Standard 5 and Livestock Standard 5 provide for bighorn sheep viability. (AR51:5179-5181).

Potential habitat in the Gravelly Landscape seems to remain unavailable to bighorn sheep due to the presence of the grazing allotments. The record fails to demonstrate at this stage, however, that the land occupied by the grazing allotments in the Gravelly Landscape proves necessary to support bighorn sheep viability. MFWP has indicated that augmenting the Greenhorn herd with additional

15

transplant bighorn sheep would be unlikely even in the absence of domestic sheep grazing in the Gravelly Landscape. (AR51:5170). The record indicates that bighorn sheep occupy territory between six and seventeen miles away from the allotments and are migrating away. (AR51:5167).

The Forest Service seems to have considered sufficiently the risk posed to bighorn sheep viability by domestic sheep grazing in the EIS, Forest Plan, and Report to the Chief. *McNair*, 537 F.3d at 994. The Court defers to the judgment of the Forest Service as to what evidence is, or is not, necessary to support the bighorn sheep viability analysis. *Id.* at 992. Gallatin has failed to demonstrate a likelihood of success on the merits of this claim.

ii.   *Viability Analysis Violates NEPA*

The Forest Service and MFWP entered into an MOU with Permittees in 2004 and renewed the MOU in 2008. (Doc. 4-10). The MOU prohibits the Forest Service from making any adjustments to the domestic sheep grazing. *Id*. The MOU permits any of the parties, however, to terminate the agreement unilaterally at any time. *Id*. Gallatin alleges that the MOU constitutes "relevant information" that obligated the Forest Service to make the MOU available publicly. (Doc. 4 at 22-24). Gallatin claims that the Forest Service's failure to disclose the MOU and analyze the MOU's impacts violates NEPA. *Id*.

16

It appears that the Forest Service failed to disclose any discussion of the MOU in its BDNF final EIS. The Forest Service acknowledged the existence of the MOU only when MFWP submitted comments to the BDNF final EIS. (AR23:0403). The Forest Service further acknowledged the existence of the MOU in the interdisciplinary team responses to the BDNF final EIS. (AR25:0600). The Forest Service claimed during oral argument that the MOU contains no new information required to be disclosed to the public.

The Forest Service's failure to include the MOU as part of its final EIS troubles the court. NEPA predicates the review process upon full and open disclosures of all relevant information to the public and decision makers. An agreement between a federal agency, state agency, and private stakeholders would seem to fall into the category of "relevant information." The MOU appears to demonstrate a Forest Service policy to continue domestic sheep grazing despite possible interference with bighorn sheep.

The fact that the Forest Service eventually acknowledged the MOU tempers the Court's concern. A review of the MOU seems to confirm that the Forest Service may terminate its participation at any point. This discretion on the part of the Forest Service to terminate its participation limits the effects of the MOU. The Court nevertheless agrees with Gallatin that the Forest Service should have disclosed the MOU in the final EIS and without prompting by any other party. The

17

Court remains unsure whether the Forest Service's omission, on its own, will lead to Gallatin succeeding on the merits of this claim.

iii.    Failure to Conduct a Supplemental Analysis Violates NEPA

Gallatin further argues that the Forest Service violated NEPA by failing to prepare supplemental EIS analysis on the Fossil-Hellroaring and Cottonwood Allotment Management Plans. (Doc. 4 at 26-33). Gallatin alleges that information indicating continued sheep grazing imposes significant impacts on bighorn sheep and grizzly bears qualifies as "new information" that triggers the Forest Service's duty to prepare supplemental NEPA analysis. *Id.*

The Forest Service must supplement environmental impact statements if significant new circumstances or information relevant to environmental concerns that bears on the proposed action or its impacts arise. 40 C.F.R. § 1502.9(c)(1)(ii). NEPA requires a supplement EIS if a new proposal will have a significant impact on the environment in a manner not previously evaluated and considered. *Westlands Water Dist. v. U.S. Dep't. of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (quoting *S. Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 663 (3rd Cir. 1999).

MFWP issued its final Bighorn Sheep Conservation Strategy in 2010. (AR48). The Forest Service prepared a draft Report to the Chief of the Forest Service regarding bighorn sheep management on the BDNF in 2011. (AR51). The

18

Forest Service listed bighorn sheep as a "sensitive species" after the Forest Plan had been adopted. (Doc. 4-2). Gallatin argues that all of this information qualifies as "significant new information" that triggers the Forest Service's duty to prepare supplemental NEPA analysis on the Cottonwood Allotment Management Plan. (Doc. 4 at 31).

A grizzly bear depredated four domestic sheep on the Cottonwood Allotment in August 2013. (Doc. 12-1). The U.S. Fish and Wildlife Service directed the Fossill-Hellroaring Allotment Permittee to move domestic sheep after repeated sheep-grizzly conflicts and the shooting of a grizzly bear by the Permittee in August 2013. (Doc. 4 at 31). The U.S. Fish and Wildlife Service determined that grizzly bear consumption of domestic sheep carcasses treated with lime will result in serious harm to grizzly bears. (Doc. 15-4). Gallatin likewise argues that all of this information qualifies as "significant new information" that triggers the Forest Service's duty to prepare supplemental NEPA analysis on the Fossil-Hellroaring and Cottonwood Allotment Management Plan. (Doc. 4 at 31).

Federal Defendants contend that separate federal laws exempt these grazing allotments from supplemental NEPA analysis. The 1995 Rescissions Act, Pub. L. 104-19 § 504(b), 109 Stat. 194, and the 2004 Appropriations Act, Pub. L. 108-108, § 325, 117 Stat. 1241, 1308, required the Forest Service to reissue grazing permits on the same terms and conditions as the original permits. *Great Old Broads For*

19

*Wilderness v. Kempthorne*, 452 F. Supp. 2d 71, 76-77, 81-82 (D.D.C. 2006). The

1995 Rescissions Act and the 2004 Appropriations Act further exempt grazing

allotments whose permits were renewed between fiscal years 2004 and 2008 from

the supplemental NEPA analysis requirement until ordered by the Secretary of

Agriculture. *Kempthorne*, 452 F. Supp. 2d at 77, 81-82; *W. Watersheds Project v.*

*Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 970-71 (D. Ariz. 2009).

The Forest Service renewed the Cottonwood permit in 2006 and the Fossil-

Hellroaring permit in 2008. (AR10:0261); (AR12:0273). The NEPA exemptions

mandated by the Rescissions and Appropriations Act appear to apply to these two

allotments. The Secretary of Agriculture has scheduled supplemental NEPA

analysis for the Fossil-Hellroaring to take place in 2019. (AR15:0295). It appears

that the Forest Service has no duty to conduct supplemental NEPA analysis until

2019.

Gallatin argues that the Forest Service nevertheless needed to determine

whether a supplemental NEPA analysis was necessary. Gallatin cites *Oregon*

*Natural Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889 (D. Or. 2012), for this

proposition. Plaintiffs in *Sabo* sought NEPA review of grazing permits to consider

the impacts of grazing on the Oregon spotted frog, a "sensitive species," as well as

the impacts of grazing on six sensitive mollusk and one endangered mollusk

species. The court in *Sabo* determined that grazing was causing potentially

20

irreversible harm to the frogs and mollusks and their habitat. *Id*. at 923-24.  The

court required the supplemental NEPA analysis to prevent this irreversible harm

before the scheduled NEPA analysis occurred. *Id*. Gallatin has failed to show that

similar imminent irreversible harm to a species or habitat will occur before the

Secretary of Agriculture decides to conduct further NEPA analysis.

Further, the Secretary of Agriculture has sole discretion to determine the

priority and timing for completing NEPA analysis. *Kempthorne*, 452 F. Supp. 2d at

81, *quoting* Pub.L. No. 108-108, § 325, 117 Stat. at 1308. Gallatin contends that

this Court must require the Forest Service to do a pre-analysis to determine

whether a full NEPA analysis is needed and whether it should be expedited.

Gallatin presents serious questions that the circumstances surrounding the potential

conflict between domestic sheep and grizzly bear have changed. Even this decision

to conduct a pre-analysis, however, appears to fall within the sole discretion of the

Secretary. *Kempthorne*, 452 F. Supp. 2d at 81

The 1995 Rescission Act and the 2004 Appropriations Act appear to

preclude the need for supplemental NEPA analysis here. Gallatin has failed to

demonstrate a likelihood of success on the merits of this claim.

iv.    *Biological Opinion Violates ESA*

Gallatin finally argues that the Forest Service's reliance on the U.S. Fish and

Wildlife Service's 2013 Biological Opinion ("Biological Opinion") violates ESA.

(Doc. 4 at 34-36). Gallatin claims that the Biological Opinion fails to provide adequate support for the scope of its "action area." *Id*. Gallatin also contends that the action section of the Biological Opinion fails to address the possibility that domestic sheep grazing may displace grizzly bears. *Id*. at 35.

      1.    *Fish and Wildlife's "Action Area"*

The U.S. Fish and Wildlife Service issued the Biological Opinion for the Forest Plan on May 28, 2013. (AR36). The Biological Opinion evaluated the effects of forest management on grizzly bears. *Id*. The technical determinations made as part of this Biological Opinion are entitled to the "highest" deference. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). The Biological Opinion determined that the implementation of the Forest Plan would not jeopardize the continued existence of grizzly bears. (AR36). The Biological Opinion expanded the action area to the entire BDNF based on its conclusion that grizzly bears occur and are anticipated to occur throughout the BDNF management area. (AR36:4627-28, 4633, 4648). The Court will uphold a designation of an action area supported by the record. *Native Ecosystems Council*, 304 F.3d at 902.

Gallatin challenges the action area because the Biological Opinion does not include any discussion of the methodology used to select the size of the action area. Gallatin cites *Alliance for the Wild Rockies v. Bradford*, 720 F. Supp. 2d

1193, 1220 (D. Mont. 2010), where the court determined that the EIS and EA were deficient because the Forest Service did not articulate reasons for selecting the action area that it selected. In *Bradford*, however, the Forest Service selected a small analysis area, a "Bear Management Unit," rather than the entire forest. The court noted that if the Forest Service wanted to look at a smaller area than the entire forest when assessing cumulative effects, the Forest Service must provide justification for that small area within the record. *Id*. at 1219.

Here, in contrast, the U.S. Fish and Wildlife Service selected an analysis area that encompassed the entire BDNF. Further, the U.S. Fish and Wildlife Service was analyzing a forest plan, and it selected the entire area that would be affected by the forest plan: BDNF. In addition, Gallatin has failed to point to any effects of the forest plan that are likely to occur outside of the analysis area.

The U.S. Fish and Wildlife Service's action area assesses the entire BDNF, which includes all areas of BDNF where grizzly bears might be affected by the forest plan. The Biological Opinion's designation of the BDNF as the action area does not appear to be arbitrary or capricious, especially in light of the requirement that the Court grant the highest deference to technical determinations made in a biological opinion. *Locke*, 776 F.3d at 994. Gallatin has failed to demonstrate a serious question going to the merits of this claim.

      2.    *Displacement of Grizzly Bears as a Result of Domestic Sheep Grazing*

Gallatin contends that the Biological Opinion is deficient because the U.S. Fish and Wildlife Service failed to consider the fact that domestic sheep grazing may displace grizzly bears. Gallatin points out that the biological opinion for the Sheep Experimental Station identified grizzly bear displacement from habitat as a possible effect of sheep grazing.

The Biological Opinion discusses grizzly bear displacement risks from roads, snowmobiles, vegetation management, fire management, and energy development. (AR 36:4664-87). The Biological Opinion and the 2015 Sheep Station Opinion acknowledge the possibility of grizzly bear displacement through lethal or non-lethal means as a result of conflicts with domestic sheep. (AR36:4680-82, 4715-17; Doc. 15-4). The Biological Opinion includes an incidental take statement regarding two grizzly bear conflicts, but fails to deem grazing as a displacing activity. (AR36:4680-82, 4715-17). The Sheep Station Opinion concludes that the effects of grazing displacement on grizzly bears would be insignificant. (Doc. 15-4 at 34).

This Court grants the highest deference to technical determinations within a biological opinion. *Locke*, 776 F.3d at 994. The U.S. Fish and Wildlife Service appears to have considered whether sheep grazing could displace grizzly bears. Gallatin has failed to demonstrate a serious question going to the merits of this claim.

24

# V. CONCLUSION

A preliminary injunction is warranted only when the plaintiff demonstrates a likelihood of irreparable harm before a decision on the merits can be issued and either a likelihood of success on the merits or serious questions going to the merits. Gallatin has failed to demonstrate a likelihood of irreparable harm, a likelihood of success on the merits, or the existence of serious questions going to the merits. This Court therefore need not consider the balance of the equities or the public interest.

As noted by this Court in its July 10, 2015, order, the balance of the equities and the public interest raise difficult issues for the Court. Gallatin's claims highlight the challenges faced by the Federal Defendants in balancing the interests of the grazing permittees who have used the Gravelly Landscape for their own purposes for more than a century, with the interest of the public, and the threatened or "sensitive" species whose presence they seek on the Gravelly Landscape. The seeming incompatibility of grizzly bear and bighorn sheep with domestic sheep raise problems for federal land managers tasked with the challenge to find room for each. The issues presented by Gallatin likely will remain beyond the 2015 grazing season as the federal land managers seek the proper balance. The Court will have a chance to address the merits of Gallatin's claims without the impending deadlines of a preliminary injunction looming. Gallatin has failed at this juncture to persuade

25

the court that it should be entitled to a preliminary injunction to halt the 2015

grazing season.

DATED this 27th day of July, 2015.


_____
Brian Morris
United States District Court Judge