# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| GALLATIN WILDLIFE ASSOCIATION, | CV-15-27-BU-BMM |
|    Plaintiff, | |
| v. | |
| UNITED STATES FOREST SERVICE; *et al.*, | |
|    Defendants, | |
|    and | |
| HELLE LIVESTOCK, a partnership; and REBISH/KONEN LIVESTOCK LIMITED PARTNERSHIP, | ORDER |
|    Defendant-Intervenors, | |
|    and | |
| MONTANA WOOL GROWERS ASSOCIATION and the AMERICAN SHEEP INDUSTRY, | |
|    Defendant-Intervenors | |

## I. Procedural Background

Plaintiffs Gallatin Wildlife Association, WildEarth Guardians, Western Watershed Project, and Yellowstone Buffalo Foundation ("Gallatin") have challenged the Revised Forest Plan, Allotment Management Plans, and Annual

1

Operating Instructions for the domestic sheep allotments in the Gravelly

Mountains on the Beaverhead-Deerlodge National Forest ("BDNF"). (Doc. 73 at

1.) Gallatin alleges that Federal Defendants United States Forest Service (the

"USFS") and Leanne Martin, in her official capacity as Regional Forester of the

United State Forest Service, violated the National Environmental Policy Act

("NEPA"), the National Forest Management Act ("NFMA"), and the

Administrative Procedures Act ("APA"), when they authorized the Revised Forest

Plan, Allotment Management Plans, and Annual Operating Instructions. (Doc. 73

at 3, 11-13.)

     The Court granted leave to Helle Livestock and Rebish/Konen Livestock

Limited Partnership ("Permitees") to intervene as Defendant-Intervenors on June

3, 2015. (Doc. 28.) The Court likewise granted leave to Montana Wool Growers

("MWG") to intervene as Defendant-Intervenors on August 31, 2015. (Doc. 68.)

     Gallatin moved the Court for a preliminary injunction against the USFS on

June 15, 2015. (Doc. 3.) Gallatin sought an order to enjoin grazing on the

Cottonwood and Fossil-Hellroaring allotments. These allotments constitute two of

the seven allotments subject to this action. The Court denied the motion for

preliminary injunction. (Doc. 43.)

     The parties now have filed cross-motions for summary judgment. Gallatin

requests that the Court declare that the Federal Defendants violated NEPA. (Doc.

115 at 28.) Gallatin requests that the Court grant them "an opportunity to work together to establish a binding timeline to perform NEPA analyses." *Id*. Gallatin seeks, in the alternative, permanent injunctive relief from domestic sheep grazing and trailing in BDNF. Federal Defendants contest Gallatin's claims as meritless. Federal Defendants ask the Court to grant summary judgment in their favor. (Doc. 123 at 6-7.) The Defendant-Intervenors also have offered arguments as to why Gallatin's claims should fail. (Doc. 126 at 6; Doc. 130 at 7-11.)

## II. Factual Background

Bighorn sheep, once abundant in North America and Montana, suffered large population declines in the late 1800s and early 1930s. (USFS 010472; USFS 008339). Die-offs have been attributed to contact with domestic sheep, range competition from livestock, contraction of diseases, and hunting. *Id*. The predecessor of Montana Fish Wildlife and Parks ("MFWP") began to reintroduce bighorn sheep in Montana during the 1940s. (USFS 008340.)

MFWP decided to reintroduce bighorn sheep into the Greenhorn Mountains, south of Alder, Montana, in September 2001 after having performed an environmental assessment ("EA"). (USFS 008148.) The Greenhorn Mountains occupy approximately 69,000 acres of which USFS manages about 46,000 acres. *Id*. The Bureau of Land Management ("BLM") manages approximately 23,000

acres. The Greenhorn Mountains represent a section of the Gravelly Landscape. (USFS 0000009.)

Federal Defendants have authorized Permitees to graze domestic sheep in the Gravelly Mountains. (USFS 000063-68; USFS 00389-95.) The MFWP, the BLM, and the USFS entered into a Memorandum of Understanding (the "MOU") with Permitees in 2002. (USFS 008219-24.) The 2002 MOU addressed concerns that the Permitees had raised about the possible effects that the reintroduction of bighorn sheep would have on their grazing operations and permits. (USFS 008219.) The 2002 MOU explains that the reintroduction of bighorn sheep would not cause an adjustment to "the operation or management of the [Permitees'] domestic sheep grazing operations without the [Permitees'] consent. (USFS 008220.)

The 2002 MOU also explains potential strategies designed to avoid contact between domestic and bighorn sheep to reduce the risk of disease transmission. (USFS 008220-21.) For example, the 2002 MOU encourages Permitees to contact MFWP via a satellite telephone if a bighorn sheep comes within a half of a mile of a domestic sheep or a domestic sheep allotment. (USFS 008220.) The 2002 MOU also provides that Permitees may obtain a kill permit from MFWP. *Id*. The kill permit would be used to prevent contact between bighorn sheep and domestic sheep. *Id*. The parties renewed the MOU in February 2008. (USFS 008256-60.)

The 2008 MOU allows any of the parties to the agreement to "terminate the instrument in whole, or in part, at any time before the date of expiration." (USFS 008259.)

MFWP transported 69 bighorn sheep to the Greenhorn Mountains in 2004. (USFS 008630.) MFWP set the population objective for bighorn sheep in the Greenhorn herd at 125. (USFS 008409.) The Greenhorn herd has failed to grow since the initial transplant. (USFS 008547.) In fact, the Greenhorn herd now consists of only 31 bighorn sheep as of the last observed count in April 2007. (USFS 008409; USFS 008548.) The low numbers in the Greenhorn herd creates uncertainty as to whether the population will become viable and will approach the population objective set by MFWP. (USFS 008548.)

The USFS issued a Final Environmental Impact Statement ("FEIS") for the 2009 Revised Beaverhead-Deerlodge Forest Plan in January 2009. (USFS 004870-6340.) The USFS issued its Record of Decision that approved the Revised Forest Plan on January 14, 2009. (USFS 003348-98.) Gallatin submitted one of 55 appeals to the Revised Forest Plan. (USFS 07650.) Gallatin appealed in part based on the claim that the Revised Forest Plan failed to include measures to provide habitat for bighorn sheep in their historic range. Gallatin's appeal also argued that the Revised Forest Plan failed to consider studies and science that conclude that

domestic sheep could harm the long-term viability of bighorn sheep. (USFS 006341-42.)

The reviewing officer rejected the appeals to the Revised Forest Plan. (USFS 007650.) The appeal decision notes that the Revised Forest Plan defers the bighorn sheep and domestic sheep interaction issues to site-specific decisions. (USFS 007653-54.) The reviewing officer found that the Revised Forest Plan proved "adequate to provide for the persistence of bighorn sheep." *Id*. In light of the public interest in bighorn sheep management, the reviewing officer directed the Regional Forester to review the Land Resource Management Plan and other relevant material to determine whether an amendment to the Revised Forest Plan proved necessary.

The Regional Forester created a Draft Report to the Chief. (USFS 007802.) The Draft Report to the Chief concluded that the Revised Forest Plan, which provided for cooperation with MFWP, and the allotment management plans ("AMPs") provided "sufficient direction for overall sheep management." (USFS 007830.) Gallatin now challenges the Revised Forest Plan and Federal Defendants' alleged failure to prepare supplemental NEPA analyses for the AMPs. (Doc. 115 at 12-13.)

### III. Legal Framework

#### A. Summary Judgment

The Court may grant summary judgment when no genuine issue of material fact exists and the moving party should be entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment proves "particularly applicable to cases involving judicial review of final agency action." *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1207 (D. Mont. 2010) (citing *Occidental Engineering Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). Summary judgment proves appropriate in this case when the issues presented address the legality of federal defendants' actions based on the administrative record and do not require a resolution of factual disputes. *Forest Serv. Employees for Envtl. Ethics*, 726 F. Supp at 1207.

## B. APA Review

Gallatin's claims stem from alleged violations of NEPA and NFMA (Docs. 1, 3.) The Court reviews compliance with NEPA, NFMA, and Endangered Species Act under the judicial process set forth in the Administrative Procedures Act ("APA"). 5 U.S.C. §§701-706; *Native Ecosystems Council v. Dembeck*, 304 F.3d 886, 891 (9th Cir. 2002). The decision may be set aside only when the court finds the agency's decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Oregon Nat. Resources Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). A final agency decision will be overturned only if the agency committed "clear error in

judgment." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378

(1989). Additionally, the reviewing court shall compel an agency to act when the

agency has "unlawfully withheld or unreasonably delayed" its decision or action. 5

U.S.C. 706(1).

## C. NEPA Background

"NEPA declares a broad national commitment to protecting and promoting

environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 348 (1989). NEPA represents a procedural statute in that it "does not mandate

particular results, but simply prescribes the necessary process." *Robertson*, 490

U.S. at 350. NEPA ensures that the agency will consider detailed relevant

information concerning environmental impacts before the agency commits

resources. *Id.* at 349. Accordingly, federal agencies must take a "hard look" at the

environmental consequences of their actions through the creation of environmental

impact statements ("EISs") and EAs. *Marsh*, 490 U.S. at 374; *See* 40 C.F.R. §§

1501.3, 1501.4, 1508.9, 1508.11. An EIS must provide a "full and fair discussion

of significant environmental impacts" and "inform decisionmakers and the public

of the reasonable alternatives which would avoid or minimize adverse impacts or

enhance the quality of the human environment." 40 C.F.R. § 1502.1

## IV. Discussion

Gallatin argues that Federal Defendants have violated NEPA. Gallatin challenges three aspects of the Federal Defendants decision under NEPA: (1) the USFS's alleged failure to explain adequately its use of the habitat-as-proxy/coarse filter methodology; (2) the USFS's alleged failure to disclose the MOUs in its NEPA analysis; and (3) the USFS's alleged failure to supplement the AMPs.

**A. Habitat by Proxy/Coarse Filter Methodology**

Gallatin argues that the USFS violated NFMA, and, therefore, NEPA, when it failed to explain the use of the "habitat-as-proxy" or "coarse filter" methodology employed by its Forest Plan NEPA analysis. A NFMA violation can establish a violation under NEPA when the violation pertains to a procedural requirement. *Lands Council v. Cottrell*, 731 F. Supp. 2d 1074, 1090 (D. Idaho 2010). Gallatin asserts that the USFS has failed to demonstrate how the use of the methodology ensures the viability of bighorn sheep habitat.

1. Purpose of the Forest Plan.

The NFMA grants the USFS authority to "promulgate regulations" that "set out the process for the development and revision of the land management plans." 16 U.S.C.A. § 1604(g). These regulations should specify procedures that ensure land management plans comply with NEPA. U.S.C.A. § 1604(g)(3). The forest plans must "provide for diversity of plant and animal communities based on the

suitability and capability of the specific land area in order to meet overall multiple-use objectives" 16 U.S.C.A. § 16(g)(3)(B).

The USFS developed the 2009 Forest Plan in accordance with the 1982 planning rule. 36 C.F.R. Part 219 (2000). The 1982 rule requires the USFS to manage fish and wildlife habitat to sustain viable populations of existing species in the planning area. 36 C.F.R. § 219.19 (2000); National Forest System Land and Resource Management Planning, 47 FR 43026-01. (emphasis added). The 1982 planning rule focuses on the maintenance of sufficient habitat. The 1982 rule contains no specific provision that requires the USFS to sustain viable populations of bighorn sheep, or any specific species.

The Court in *Western Watershed Project v. Salazar*, 766 F. Supp. 2d 1095, 1113 (D. Mont. 2011), determined that the USFS should not be required to add a specific species— in that case, bison— to the forest. The court determined that NFMA did not require the USFS to add bison to the forest to provide for animal diversity. *Id*. The 1982 planning rule requires only that the USFS manage the habitat so that it could sustain viable populations of existing species.

The coarse filter approach assumes that the USFS can maintain viability for species that evolved and became adapted to local habitat conditions by maintaining historic patterns, size class structure, and acreage of habitat necessary for species survival. (USFS 003881.) *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 933

(9th Cir. 2010). Gallatin does not appear to challenge the validity of this assumption.

Gallatin instead seems to take issue with what it perceives as the USFS's exclusive focus on the coarse filter approach. Gallatin argues that the USFS should have applied a fine filter analysis instead of a coarse filter analysis. The Court will defer to the USFS's use of the coarse filter method unless the record indicates that the USFS made a clear error in judgment. *Marsh*, 490 U.S. at 378.

Gallatin argues that the USFS focused solely on the bighorn habitat when it applied the coarse filter method, and, in doing so, failed to address several other impacts "vital to bighorn viability." (Doc. 115 at 18.) Gallatin asserts that the USFS's evaluation failed to consider the bighorn sheep's proximity to domestic sheep. This proximity limits the area of suitable bighorn habitat and potentially exposes bighorns to a greater risk of disease. (USFS 008220-21; USFS 008329.) Gallatin argues further that the USFS has failed to consider the fact that the Greenhorn herd consists of 31 bighorn sheep. Gallatin points out that the surviving bighorn sheep represent a fraction of the population objective of 125 set by MFWP. (USFS 008409.)

2. Potential for Disease Transmission.

The FEIS appears to have accounted for the threat of disease transmission to bighorn sheep from livestock grazing. (USFS 005383.) The FEIS acknowledged

that the USFS considered the threat highest in the Gravelly range where five active

domestic sheep allotments exist. *Id*. The FEIS further considered that MFWP

monitors local bighorn sheep for possible disease transmission. *Id*. The Draft EA

discussed plans to administer antibiotics to bighorn sheep to reduce the possibility

of infection and disease. (USFS 008089.) The FEIS also noted that MFWP did not

advocate for reductions in the BDNF sheep-grazing program (USFS 005383.) In

fact, MFWP provided no comments related to changing domestic sheep grazing

during the environmental analysis process. (USFS 005383.)

The Report to the Chief noted that grazing allotments did not appear to be a

spatially limiting factor to the grazing of the bighorn sheep herd in the BDNF.

(USFS 007830.) The USFS determined that its allotment specific management

plans and its plans to coordinate with MFWP provided sufficient direction for the

management of bighorn sheep on BDNF. *Id*. The USFS concluded that these facts

did not warrant an amendment for bighorn sheep. *Id*.

The FEIS appears to defer the resolution of bighorn and domestic sheep

conflicts to a determination on an allotment by allotment basis in the AMPs. *Id*.

The combination for the allotment specific plans and the coordination between

state and federal agencies seems to have led the Regional Forester to determine

that the coarse filter analysis contained in the Revised Forest Plan provided

adequate direction for the management of the forest for bighorn sheep. *Id*. The

Revised Forest Plan requires that state and federal agencies coordinate to develop specific plans based on changing circumstances on the allotments.

Gallatin suggests that the USFS should have used a "fine filter" analysis instead of a coarse filter analysis. The USFS typically conducts a fine filter analysis to maintain the diversity and population viability of a species in a given geographic area that may not be considered fully by the coarse filter. (USFS 004465.) The USFS applies a fine filter analysis to federally-listed species or species considered "sensitive species" by the Regional Forester. (USFS 004465.) The USFS also applied a fine filter analysis to species on the BDNF with viability concerns and species on the BDNF that qualified as high priority state species of concern. (USFS 004466.)

Species that typically require a fine filter analysis include those that: "(1) have undergone significant declines in abundance or distribution, (2) are known to use highly specialized or unique habitat, or (3) are isolated endemics." (USFS 003503.) The USFS considers multiple factors to determine whether viability concern exists for the species in the plan area. The USFS applied these factors to identify several species on the BDNF that required fine filter analyses. *Id.* The USFS concluded that the bighorn sheep did not require a fine filter analysis. (USFS 004466.)

<u>3. Deference to Agency's Choice of Methodology.</u>

Gallatin argues that the USFS failed to follow its own guidelines when it

determined whether to apply a coarse filter or fine filter analysis. Gallatin points to

a USFS document that states that "[t]he coarse filter approach suggests viable

populations will be maintained when the referenced communities contain almost

all the species with the exception of those . . . with consistently sparse population

densities." (USFS 010925.) Gallatin contends that that this language should be

interpreted to mean that the USFS should not apply a coarse filter methodology to

habitats that include species with consistently sparse population densities. Even if

the Court adopted Gallatin's interpretation of the language in USFS's Consistency

in Land and Resource Management Plans document, however, the USFS

adequately has explained its reasoning for having applied a coarse filter rather than

a fine filter in this instance.

The FEIS describes the habitat-as-proxy, or coarse filter analysis, and the

fine filter analysis. (USFS 004464–69.) The FEIS explains the difference between

the two methods. The FEIS further explains the reasons that the USFS applied the

coarse filter analysis instead of the fine filter analysis. *Id*. The Regional Forester

did not consider bighorn sheep "sensitive species" at the time that the USFS

performed the Revised Forest Plan's environmental analysis. Six bighorn sheep

die-offs occurred in 2009 and 2010. (USFS 008296.) The USFS Regional Office

analyzed the bighorn population after the die-offs. These die-offs caused the USFS

Regional Office to determine that bighorn sheep should be considered "sensitive" region wide. (USFS 008298.)

The Court defers to the USFS's methodology for evaluating viability. *Marsh*, 490 U.S. at 378. The Court grants "greater-than-average" deference to the USFS "as it relates to its choice of technical methodologies." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1108 (9th Cir. 2016). The record indicates that the USFS provided for bighorn sheep viability in the Forest Plan. The record further indicates that the USFS considered fully materials relevant to bighorn sheep viability. The USFS explained the difference between fine filter and course filter methodologies and its basis for having used the coarse filter method instead of the fine filter method.

Based on the information before the Court, and the deference owed to the agency when undertaking technical analysis within its purview, the USFS does not appear to have acted arbitrarily or capriciously with regard to its use of the coarse filter methodology. *Id*. This conclusion recognizes the USFS's repeated assertion that its responsibility focuses on bighorn sheep habitat. By implication, MFWP would manage the bighorn sheep population. This determination fails to end the inquiry, however, of the adequacy of the entire NEPA analysis. The Court turns next to the USFS's failure to disclose the MOUs.

**B. MOU Disclosure**

Gallatin next argues that Federal Defendants violated NEPA when they failed to disclose the MOUs and analyze their potential impacts on bighorn sheep management in the body of its NEPA analysis. The USFS, the BLM, and the MFWP entered into the first MOU with Permitees in 2002. The same parties renewed the MOU in 2008. (USFS 008256.) The 2008 MOU expires January 31, 2018. (USFS 008259.)

The renewed 2008 MOU modified some of the provisions in the 2002 MOU. For example, the renewed MOU made it clear that the MOU did not prevent Permitees from engaging in similar activities with other agencies. *Id*. The renewed MOU's terms indicate that the agreement does not create any trust responsibility enforceable by a party against the United States. *Id*. The renewed MOU also removed the provision from the 2002 MOU that allowed the Permitees to transfer the agreement to subsequent landowners. (USFS 008222.) Most importantly, the renewed MOU allows any party to the agreement to terminate the MOU in whole, or in part, at any time before the date of expiration. (USFS 008259.) The 2002 MOU's termination provision allowed for termination only upon a party having shown good cause. (USFS 008222.)

The MOUs involve the manager of bighorn sheep habitat in the BDNF—the USFS, the apparent manager of the bighorn sheep population in the BDNF—the MFWP, and the Permitees who graze domestic sheep on or near bighorn sheep

habitat in the general vicinity of bighorn sheep population in the BDNF. Both the

original 2002 MOU and the renewed 2008 MOU provide assurances to Permitees

that the reintroduction of bighorn sheep by MFWP would not affect their grazing

operations and permits. (USFS 008219; USFS 008257.) The MOUs do not grant

Permitees a kill permit for bighorn sheep. The MOUs explain instead that

Permitees may obtain a kill permit from MFWP. (USFS 008220.) Permitees

apparently would use a kill permit to prevent contact between bighorn and

domestic sheep. (USFS 008220.)

### 1. The Federal Defendants Acknowledgment of the MOUs.

Gallatin argues that the USFS's failure to disclose the MOUs precluded the

public from considering the MOUs and their potential impact on bighorn sheep in

the BDNF before the USFS made its decision. The USFS acknowledged the

existence of the MOUs only through responses to public comments documented in

the FEIS. An EIS must contain "a reasonably thorough discussion of the significant

aspects of the probable environmental consequences" of an action. *Ctr. for

Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003.)

NEPA documents must concentrate on "truly significant" issues to the action in

question, "rather than amassing needless details." *League of Wilderness Defs. Blue

Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1136 (9th Cir. 2010).

"NEPA only requires agencies to discuss impacts in proportion to their

17

significance." *Pacific Coast Fed'n of Fisherman's Ass'ns v. Blank*, 693 F.3d 1084, 1102 (9th Cir. 2012) (citing 40 C.F.R. § 1502.2(b)) (internal quotations omitted).

The existence of the MOUs strike the Court as something more than a "needless detail." *Allen*, 615 F.3d at 1136. Moreover, the USFS's complete failure to disclose on its own the existence of the MOUs fail any test of proportionality of the MOUs' apparent significance. Federal Defendants argue nevertheless that Gallatin has mischaracterized the significance of the MOUs. Federal Defendants describe the 2008 MOU as a "voluntary agreement" that does not constrain the USFS's decision-making.

The USFS claims that it possesses authority to modify and cancel grazing permits if needed. The terms of the grazing permit allows the USFS to suspend or cancel the agreement for good cause. (USFS 000010.) Specifically, the permit may be canceled or modified for failure to comply with the terms of the permit, or to conform to changes in the law, changes in AMPs or other land management plans, or changes in resource conditions. (USFS 000010.)

The 2008 version of the MOU contemplates that modifications of the MOU "shall be made by the mutual consent of the parties." (USFS 008259.) The 2008 MOU's terms provide that "any of the parties, in writing, may terminate the MOU in whole, or in part, at any time before the date of expiration." (USFS 008259.) Federal Defendants argue that this provision allows the USFS to modify the terms

of the MOU. (USFS 008259; USFS 000010; USFS 000347.) Federal Defendants argue that the USFS discussed the MOUs in proportion to their significance. The record indicates, however, that the parties seemed to place some significance on the MOUs.

A MFWP staff member noted in meeting minutes from a MFWP Commission Meeting that the USFS "has stated in a writing the occurrence of bighorn sheep in the Greenhorns will not be used as a reason to discontinue domestic allotments in the area." (USFS 008162.) The MFWP employee acknowledged that "Montana's agricultural community is integral to management of Montana's fish and wildlife populations." (USFS 008162.) The MFWP employee acknowledged that the USFS's commitment that reintroduction would not impact the allotments proved important. (USFS 008162.)

Even if the USFS possesses the ability to modify or unilaterally terminate the 2008 MOU at any time, the agreement represents some commitment on behalf of the USFS to the Permitees that the bighorn sheep reintroduction would not impact their allotments. The MOUs provide Permitees with potential strategies to deal with the reintroduction of bighorn sheep without endangering their domestic sheep, including the issuance of kill permits.

The Court recognizes that NEPA does not require an agency to amass needless details. The impacts of this document appear, however, to have a

significant effect on the bighorn sheep's environment in the Greenhorn Mountains.

MFWP introduced 69 sheep into the Greenhorn Mountains. MFWP reports that 46

of these sheep have died or have been removed. (USFS 008290.) MFWP has

removed 34 of these sheep due to their proximity to lands controlled by domestic

sheep producers. *Id*. The MOUs show an apparent commitment by USFS to

prioritize domestic sheep over bighorn sheep in the event the two species become

at risk of contact. The commitment undertaken by the USFS and the BLM pursuant

to the MOUs appear to have some significance in the management of bighorn

sheep habitat in the Greenhorn Mountains.

### 2. Response to Public Comments.

Federal Defendants argue that they met their burden under NEPA to disclose

the MOUs when they acknowledged the MOUs during the comment process.

Federal Defendants point out that Gallatin must have been aware of the MOUs

during the NEPA process as Gallatin discussed the MOUs in its public comments.

(USFS 000878.) Glenn and Laurie Hockett, on behalf of Gallatin, sent the USFS

an email with attachments that contained comments to the EIS. (USFS 000865.)

In one of these attachments, a Gallatin member commented that the MOUs

placed a higher priority on domestic sheep than bighorn sheep in the area. The

Gallatin member asked how the USFS could justify that priority. (USFS 000878.)

The USFS responded to the comment with a thoughtful non-response that reads in

its entirety: "[t]his attachment was reviewed in the context of comments within this letter." (USFS 002490.) The USFS's acknowledgement of the MOUs in the response to the comment failed to address directly the MOUs. MFWP also addressed the MOUs in its comments to the EIS. (USFS 000844.) The USFS responded that the comment somehow had been resolved. The USFS failed to supply, however, any new information to indicate how the issue actually had been resolved. (USFS 001780.)

It further strains credulity for the USFS to suggest that its admission of the MOUs' existence complies with the letter, if not the spirit, of NEPA. The USFS fails to explain why the public must connect the dots regarding its efforts and intention to protect bighorn sheep habitat. NEPA serves to inform the public of the issues that arise from a potential action undertaken by a federal agency. *Robertson*, 490 U.S. at 350. The USFS failed to meet its obligations under NEPA to inform the public of the issues that surrounded the reintroduction of bighorn sheep on federal lands. *Id*.

General statements, such as the USFS's acknowledgment of Gallatin and MFWP's comments, fail to constitute a hard look absent a justification regarding why more information could not have been provided. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998). The USFS's cursory treatment of the issues presented by the MOUs raise substantial questions about the

USFS's decisions regarding bighorn sheep management in the Revised Forest Plan. *Id.* The Court can conceive of no good reason why a federal agency would fail to disclose agreements between a federal agency, state agency, and private stakeholders regarding the management of the reintroduction of a species. The consequences of the MOUs potentially impacts the availability and extent of the bighorn sheep's habitat.

### 3. Harmless Error Analysis.

Federal Defendants argue that even if the Court determines that the USFS should have disclosed the MOUs in its FEIS, its failure to do so resulted in harmless error. An EIS should "foster both informed decision-making and informed public participation." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001). The USFS precluded the opportunity for public comment on the MOUs when it failed to disclose their existence or their possible impact on bighorn sheep. *See Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994). NEPA remains a process oriented requirement. *Id.* at 523. It contains no substantive requirements. *Id.* As a result, a technical non-disclosures does not always translate into a NEPA violation. *Id.* at 527.

NEPA ultimately seeks to prevent the risk of damage to the environment that results if the agency fails to evaluate properly and thoroughly the environmental impacts of a proposed project. *Id.* NEPA's objective requires that a federal agency

consider significant aspects of an environmental impact of a proposed action and inform the public of its consideration. *Pit River Tribe v. USFS*, 469 F.3d 768, 781 (9th Cir. 2006). The Court will not grant relief when the decision-maker fully considered the environmental consequences and the decision met NEPA's goals, even in light of a procedural violation. *Laguna Greenbelt, Inc.*, 42 F.3d at 527 (citing *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023 (9th Cir. 1980)).

The Revised Forest Plan relies on coordination between MFWP, the BLM, and the USFS. The USFS has relied on these other agencies to resolve bighorn sheep and domestic sheep conflicts through allotment specific plans. The USFS's analysis deferred management of bighorn and domestic sheep interactions to site-specific decisions rather than using a more comprehensive approach. (USFS 7654.) Bighorn sheep exist on lands outside USFS managed land. (USFS 007803.) The USFS recognizes that this reliance requires the Revised Forest Plan to cooperate with other agencies and governments to resolve issues between domestic sheep and bighorn sheep. (USFS 007803.)

The MOUs document the USFS's attempt to cooperate with other agencies and stakeholders to resolve environmental consequences that may arise from the interactions of bighorn and domestic sheep. The MOUs represent an agreement between a state agency, federal agencies, and Permitees who operate domestic

23

sheep allotments. The MOUs set forth potential strategies to avoid contact between the domestic sheep and the bighorn sheep. The Court cannot consider this agreement irrelevant in light of the Revised Forest Plan's reliance on coordination between these entities.

The complete non-disclosure of these highly relevant agreements in the body of the EIS frustrates NEPA's objective to ensure that the public has the opportunity to consider whether the USFS has considered environmentally relevant information in their decision-making process. The USFS's disclosure of the MOUs and their impact would have allowed the public to question their application to the USFS's management of the allotments. In particular the public could have raised questions regarding the issuance of kill permits to the Permitees contemplated by the MOUs. Disclosure of the MOUs also could have allowed the public to seek clarification on the Agencies' apparent agreement not to adjust the operation or management of the allotments without the Permitees' consent.

A NEPA violation amounts to more than harmless error when it "prevent[s] a proper, thorough, and public evaluation of the impact of the Project." *Lands Council v. Powell*, 395 F.3d 1019, 1037 n.25 (9th Cir. 2004) (citing *Laguna Greenbelt, Inc.*, 42 F.3d at 527)). The Court recognizes that NEPA represents a procedural statute in that it does not mandate substantive results. *Oregon Nat. Desert Ass'n v. Bureau of Land Mgt.*, 625 F.3d 1092, 1099 (9th Cir. 2010). NEPA

does mandate, however, a "democratic decisionmaking structure" that proves "almost certain to affect the agency's substantive decisions." *Id*. The USFS's failure to disclose the MOUs hindered the public's ability to comment on their impacts, and, in turn, hindered the USFS's decision-making process. The failure to disclose the MOUs violated the NEPA's required procedure.

The USFS's failure to describe the MOUs as part of the NEPA process raises concerns that the USFS may have made a unilateral decision to omit other pertinent information from the NEPA process. For example, the 2008 MOU provides that it does not obligate the expenditure or reimbursement of any funds to implement. (USFS 008259.) The 2008 MOU does provide, however, that any exchange, reimbursement, or contribution of funds would be handled separately. *Id*. This provision give rise to the question of whether any such separate agreements exist.

The 2008 MOU further provides that it may be modified only by "mutual consent of the parties." *Id*. This provision could be interpreted to provide the Permitees with veto power over any future modification of management of the allotments. The USFS argues that the 2008 MOU may be terminated at any time to support its claim that the 2008 MOU should be considered non-binding. The 2008 MOU's terms allow either party to terminate the agreement in whole or in part for any reason. (USFS 008259.) The actions the USFS and Permitees have taken under

the MOUs speak louder than words. The record indicates that the parties to the MOUs have placed some significance on the agreement.

The MOUs allow domestic sheep producers to obtain kill permits from MFWP to use in the event a bighorn sheep comes too close to domestic sheep. This provision seems to favor domestic sheep over bighorn sheep. The MOUs represent a commitment by the USFS to protect domestic sheep. In light of these facts, the MOUs represent a significant document despite the USFS's apparent ability to terminate at any time. The USFS's disclosure of the MOUs and their alleged non-binding nature would have allowed the public to raise questions regarding their significance.

NEPA's procedures demand that the public have a full opportunity to question the USFS and to receive answers from the USFS regarding the meaning and application of the MOUs. Assurance by the USFS that it has reviewed the MOUs "in the context" of the public's inquiry falls well short of the fully informed decision making contemplated by NEPA. The public has a right to expect better of its governmental agencies. The Court will enforce the public's reasonable expectation here. The USFS fell short of its obligation to take a "hard look" at the effects of the 2002 and 2008 MOUs. *Marsh*, 490 U.S. at 374.

### C. Supplementation for AMPs

Gallatin argues that the USFS failed to consider whether sufficient new information existed that required supplemental NEPA analysis for the AMPs. Gallatin contends that the USFS violated NEPA a second time when it ultimately failed to complete such analyses. The agency must evaluate new information to determine whether the new information requires a supplemental EIS. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000). An agency should supplement an EIS when significant new circumstances or information relevant to environmental concerns and bearing on the proposed action exist. 40 C.F.R. § 1502.9(c).

### 1. AOIs Establish Final Agency Action.

Amicus Montana Farm Bureau Federation ("MFBF") asserts that Gallatin's supplementation argument lacks merit because no ongoing federal action exists. MFBF relies on *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004), for this proposition. Sothern Utah Wilderness Alliance ("SUWA") alleged in *Norton* that the Bureau of Land Management ("BLM") had failed to act to protect Utah public lands from environmental damage caused by off-road vehicles. *Norton*, 542 U.S. at 58-60. SUWA claimed, among other allegations, that BLM had failed to take a "hard look" at whether NEPA obligated the BLM to undertake supplemental analyses for areas where off-road vehicle use had increased. *Id*. at 60.

The United States Supreme Court considered whether a federal court's authority under the APA to "compel agency action unlawfully withheld or unreasonably delayed" extended to the BLM's management of public lands under its own planning documents. *Id*. at 57. The APA authorizes suit by "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id*. (citing 5. U.S.C. § 702) (internal quotations omitted). The agency action complained of must be a final agency action where no other statute provides a private right of action. *Norton*, 542 U.S. at 61-62. The APA also provides relief for an agencies failure to complete a required discrete agency action. *Id*. at 64.

The Supreme Court determined that supplementation proves necessary only when a major federal action remains to occur. *Id*. at 73. The Court recognized that approval of a land use plan qualified as major federal action that requires an EIS. *Id*. Once the agency had approved the plan, however, no ongoing major federal action that could be supplemented exists. *Id*. The USFS argues that no federal actions exists here when it already has approved the Revised Forest Plan.

Gallatin argues that its claims prove consistent with *Norton* based on the assertion that grazing represents an ongoing activity. Gallatin argues that the USFS's issuance of Annual Operating Instructions ("AOIs") for the AMPs each year demonstrates that grazing should be considered an ongoing federal activity.

The USFS authorizes and manages grazing on specified allotments by issuing (1) grazing permits, (2) AMPs, and (3) AOIs. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 979 (9th Cir. 2006). The grazing permits, AMPs and AOIs should be consistent with the applicable forest plan. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d at 980.

The grazing permit authorizes permitees to use lands under the USFS's control for the purpose of livestock production. *Id.* at 979-80 (citing 36 C.F.R. § 222.1(b)(5)). The AMP specifies a program of action for specific allotments. *Oregon Nat. Desert Ass'n*, 465 F.3d at 980. An AOI relates forest plan directives to specific allotments. The USFS issues AOIs annually to account for changing circumstances. *Id.* Gallatin challenges the USFS's failure to evaluate whether the site-specific AMPs required supplementation and the USFS's failure to supplement the AMPs.

Forest-wide management practices typically do not constitute final agency actions. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009). Challenges to forest-wide management practices or claims must be made in the context of site-specific actions. *Id.* Gallatin must allege a specific connection between the challenged site-specific action and the general forest-wide management practice. *Id.*

The Complaint challenges the USFS's failure to supplement allotment-specific AMPs. AMPs must be consistent with the general applicable forest plan. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d at 980. The USFS issues AOIs for each allotment. The Ninth Circuit has recognized that an AOI qualifies as a "discrete, site-specific" final agency action. *Id.* at 990. The issuance of AOIs demonstrate the USFS's ongoing supervision over the challenged grazing. The USFS still maintains a "meaningful opportunity to weigh" the benefits of the grazing versus the possible detrimental effects grazing may cause on the environment. *Id.*

## 2. Appropriations Act.

Federal Defendants contend that separate federal laws exempt the challenged grazing allotments from supplemental NEPA analysis. The 1995 Rescissions Act, Pub. L.104-19 § 504(b), 109 Stat. 194, and the 2004 Appropriations Act, Pub. L. 108-108, § 325, 117 Stat. 1241, 1308, require the USFS to reissue grazing permits on the same terms and conditions as the original permits. *Great Old Broads For Wilderness v. Kempthorne*, 452 F. Supp. 2d 71, 76-77, 81-82 (D.D.C. 2006). The 1995 Rescissions Act and the 2004 Appropriations Act further exempt grazing allotments whose permits the USFS shall renew between fiscal years 2004 and 2008 from NEPA requirements until ordered by the Secretary of Agriculture.

*Kempthorne*, 452 F. Supp. 2d at 77, 81-82; *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 970-71 (D. Ariz. 2009).

The court in *Kempthorne* determined that "Congress amended 'all applicable laws' to require reissuance of expired, transferred or waived grazing permits prior to the completion of otherwise required action." *Kempthorne*, 452 F. Supp. 2d at 81. The court in *Kempthorne* interpreted the federal riders to toll NEPA requirements as they pertain to managing grazing allotments generally. *Id*. at 81-82. These riders exempt qualifying allotments from supplemental NEPA analysis until the Secretary of Agriculture orders the analysis. The Secretary of Agriculture possesses authority to determine the priority and timing for completing NEPA analyses. *Id.* at 81; Pub. L. No. 108-108 § 325, 117 Stat. at 1308.

Gallatin argues that this NEPA exemption should be limited only to those analyses prepared as a matter of course when renewing grazing permits. Gallatin asserts that the text of the Appropriations Act mentions only analyses for permit renewals and does not address supplemental NEPA analyses. Gallatin argues that Congress's enactment of the Appropriations Act attempted to remedy a large number of grazing permits expiring over a short period of time.

"Section 325 of Public Law 108–108 provides in pertinent part that a grazing permit which expires during 2004-2008 'shall be renewed' and the terms and conditions contained in the expired permit 'shall continue in effect under the

renewed permit' until the Forest Service 'completes processing of such permit . . . in compliance with all applicable laws and regulations.'" *Oregon Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 922 (D. Or. 2012). The legislation resulted from a congressional concern that performing NEPA analyses for a large number of expiring grazing permits would strain the USFS's resources. *Wildearth Guardians v. U.S. Forest Serv.*, 668 F. Supp. 2d 1314, 1322 (D.N.M. 2009).

The court in *Sabo* addressed Public Law 108–108's application to grazing permits. *Sabo*, 854 F. Supp. 2d at 922. *Sabo* interpreted Public Law 108–108 to limit the NEPA exemption only to permits for grazing renewals, or the AOI. *Id*. at 922-923. The court declined to interpret Public Law 108–108 as barring plaintiff's claim when the claim did not relate to a renewal of a grazing permit. *Id*. at 922-23. The court allowed the plaintiffs to proceed with claims that challenge the adequacy of the environmental review for an AMP.

The USFS attempts to distinguish *Sabo*. The USFS argues that the court in *Sabo* determined that supplementation proved necessary despite the Appropriations Act rider due to plaintiffs having shown that continued cattle grazing would cause potentially irreversible harm to sensitive plant and animal species and their habitat. The USFS argues that bighorn sheep do not exist on the allotments at issue here. As a result, the USFS argues that Gallatin has not shown that domestic sheep grazing may cause potentially irreversible harm to bighorn sheep or their habitat.

*Sabo* did not premise its interpretation that Public Law 108–108 to the facts of the case. *Id*. at 922. The Court agrees with *Sabo*'s interpretation of Public Law 108–108 that it imposes no bar to a challenge to the potential need for supplemental environmental review for AMP. The 1995 Rescissions Act and the 2004 Appropriations Act do not bar Gallatin's supplementation claim.

### 3. New Information.

An agency must remain alert to new information that may alter the results of its original environmental analysis and "continue to take a hard look at the environmental effects of its planned action, even after a proposal has received initial approval." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000). Gallatin argues that the USFS has failed even to consider and evaluate the need for a supplemental EIS in light of alleged new information.

Gallatin suggests that five new pieces of information warrant a supplemental analysis: (1) the reintroduction of bighorn sheep; (2) the 2011 listing of bighorn sheep as a sensitive species; (3) the existence of the MOUs; (4) updated information regarding disease transmission between domestic sheep and bighorn sheep; and (5) the consideration by MFWP that bighorn sheep could be reintroduced to closed allotments. "When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require [a supplemental EIS]." *Id*.

The USFS contends that it considered this new information in its draft Report to the Chief. (USFS 007796-7896.) The USFS drafted the Report to the Chief in reaction to the Regional Forester's direction to determine whether the Revised Forest Plan should be amended to provide a more comprehensive analysis of bighorn sheep and domestic sheep interactions. (USFS 007802.) The document addresses a possible deficiency in the Revised Forest Plan. Gallatin has challenged the USFS's failure to supplement seven AMPs. (Doc. 1 at 7.) The draft Report to the Chief fails to address whether new information warrants supplementation to the AMPs. The USFS last performed NEPA analyses for these AMPS at various times between 1979 to 2000.

New developments have occurred since 2000, and certainly since 1979, that would require the USFS to evaluate whether it should be required to supplement the NEPA analyses for these allotments. The USFS knew of the reintroduction of bighorn sheep to the area. The USFS knew that the USFS Regional Office had designated bighorn sheep a sensitive species region wide in 2011. The USFS knew that it had entered into an original MOU in 2002 and a renewed MOU in 2008. The USFS also knew of information regarding disease transmission. The record fails to establish whether the USFS timely considered the need for NEPA supplementation for the AMPs in light of this information. The USFS's "failure to evaluate the need

to supplement the original EIS in light of that new information violated NEPA." *Dombeck*, 222 F.3d at 557.

## V. Conclusion

In light of the deference afforded the USFS methodology for evaluating viability required under *Vilsack*, the Court concludes that the USFS's bighorn sheep viability analysis for the Revised Forest Plan proves sound and complies with NEPA. The USFS violated its obligations under NEPA, however, when it failed to disclose the existence of the 2002 MOU and the 2008 MOU in its EIS for the Revised Forest Plan. This information constituted more than "needless detail" that warranted disclosure. Finally the USFS violated NEPA when it failed to demonstrate that it had evaluated new information to determine whether it should perform supplemental NEPA analyses for the AMPs.

Gallatin has sought to enjoin domestic sheep grazing on Forest Service allotments. A Court considering injunctive relief must balance the hardships between the plaintiff and defendant and consider the public's interest. This test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). As noted by the Court in its July 10, 2015, Order and its July 27, 2015, Memorandum in Support of its Order, the balance of the equities and the public interest raise difficult issues. The seeming incompatibility of bighorn sheep and domestic sheep raise problems

for all parties involved. The deficiencies identified in the USFS's Revised Forest Plan and AMPs involve the inaction or failures of the USFS. The Court hesitates to fashion a remedy for these failures that falls entirely on the Permitees who appear to have acted in compliance with the conditions of their grazing permits. The Court recognizes, however, that these deficiencies must be remedied.

The Court declines to enjoin further domestic sheep grazing at this juncture. The Court instead will allow Federal Defendants to attempt to remedy the deficiencies identified herein on an expedited basis. Domestic Sheep have grazed on the Gravelly Landscape since the 1860s. (Doc. 31 at 2.) MFWP decided to introduce bighorn sheep to the Gravelly Landscape in September 2001 (USFS 008148.) Gallatin contends that the presence of domestic sheep grazing prevents the bighorn sheep herd from growing to a viable size, and, therefore, causes irreparable harm. Gallatin also contends that domestic sheep grazing harms their members' aesthetic and recreational interests in the area. Gallatin contends that enjoining domestic sheep grazing will allow the bighorn sheep herd to grow.

The Court deems it appropriate at this stage to defer a decision on whether to enjoin domestic sheep grazing until the USFS has resolved the deficiencies in its analysis. The USFS will need to consider the appropriateness and scope of future domestic grazing based upon a full and open environmental review process. This full and open environmental review process must include the discussion of the

2002 and 2008 MOUs. This full and open environmental review process also must consider whether sufficient new information has emerged that requires the environmental review for the AMPs to be updated. The USFS must decide at the end of this process how to address the conflict between domestic sheep grazing and the reintroduction of bighorn sheep in the Gravelly Landscape. Accordingly, **IT IS ORDERED** that:

1. The Federal Defendants' motion for summary judgment regarding its use of the coarse filter or habitat by proxy methodology is **GRANTED in part**. (Doc. 122).

2. The Federal Defendants shall issue a supplemental EIS for the 2009 Revised Forest Plan that evaluates the potential environmental consequences of the 2000 MOU and the 2008 MOU. The Federal Defendants shall provide to the Court within 30 days a schedule of the proposed supplemental EIS.

3. The Federal Defendants shall conduct a review of the five issues raised by Gallatin, and any other pertinent new information, to determine whether any, or all, of this new information warrants supplementation of the original EIS prepared for the AMPs at issue here. The Federal Defendants shall provide to the Court within 30 days a schedule for the completion of this review.

DATED this 14th day of June, 2016.

Brian Morris
United States District Court Judge